NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 260358-U

NO. 4-26-0358

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 16, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* K.N., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | McLean County |
| Petitioner-Appellee, | ) | No. 24JA50 |
| v. | ) | |
| Nathaniel N., | ) | Honorable |
| Respondent-Appellant). | ) | John Brian Goldrick, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Zenoff and Harris concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The appellate court affirmed, finding the trial court's unfitness finding was not against the manifest weight of the evidence.

¶ 2       In July 2025, the State petitioned to terminate the parental rights of respondent, Nathaniel N., the father of K.N. (born in December 2019). In March 2026, the trial court granted the petition. Nathaniel appealed, arguing the court's unfitness finding was against the manifest weight of the evidence. We affirm.

¶ 3                               I. BACKGROUND

¶ 4       On May 28, 2024, the State filed a petition for adjudication of wardship, alleging K.N. and his siblings were neglected because their environment was injurious to their welfare pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (705 ILCS 405/2-3(1)(b) (West 2024)). A shelter care report filed on the same day alleged K.N.'s mother, Destiny C., had a

history of substance abuse and had recently "gone on a drug bender," during which she purchased and smoked crack cocaine in a vehicle with her children present. Destiny had extensive prior involvement with the Illinois Department of Children and Family Services (DCFS), and she had been arrested in February 2023 for "endangering the life and health of a child and DUI/Drugs." We note that neither Destiny nor K.N.'s siblings are part of this appeal.

¶ 5     On May 29, 2024, a stipulated temporary custody order was entered granting K.N.'s temporary custody to DCFS. On August 14, 2024, the trial court adjudicated K.N. neglected. On October 16, 2024, the court made K.N. a ward of the court and placed his custody and guardianship with DCFS.

¶ 6     On July 11, 2025, the State filed a petition to terminate Nathaniel's parental rights, alleged he was unfit because he failed to (1) maintain a reasonable degree of interest, concern, or responsibility as to K.N.'s welfare, (2) make reasonable efforts to correct the conditions causing K.N.'s removal during the nine-month period from August 14, 2024, to May 14, 2024, and (3) make reasonable progress toward K.N.'s return to his care during the same nine-month period. See 750 ILCS 50/1(D)(b), (m)(i)-(ii) (West 2024).

¶ 7     The trial court conducted a fitness hearing on December 18, 2025. Michelle Hopkins testified she was the DCFS placement worker assigned to K.N.'s case. Hopkins first interacted with Nathaniel on July 17, 2024, when he attended a court hearing remotely via Zoom. At the time, he had outstanding arrest warrants in Illinois and was living in either Oregon or Washington. Hopkins and Nathaniel exchanged contact information, but Hopkins did not hear from Nathaniel until June 2025, when he informed her that he would be extradited back to Illinois. During the case's pendency, Nathaniel reached out to Jessi C., K.N.'s foster mother, just once regarding K.N. Nathaniel did not send any items, gifts, money, or letters to K.N. He did not

visit K.N. in person.

¶ 8        A family service plan was created on July 2, 2024. Hopkins testified she was able to explain the plan to Nathaniel during their phone call regarding his extradition and she emailed a copy of the plan to him in June 2025. Under the service plan, Nathaniel was expected to complete assessments for substance abuse, mental health, and domestic violence, complete any recommended treatment, attend and complete parenting classes, and comply with random drug screens. He was also required to seek legal advice and follow any recommendations for resolving his warrants. During the nine-month period specified in the termination petition, Nathaniel's progress on all service plan goals was "unsatisfactory." Notably, the relevant nine-month period encompassed August 14, 2024, through May 14, 2025, but Nathaniel did not receive a copy of the plan until June 2025.

¶ 9        On cross-examination, Hopkins testified she could not send the service plan to Nathaniel earlier because he had been "ordered to clear up his warrants before he could have any participation in the case." Hopkins testified the delay was due to a court order, rather than a DCFS decision. On redirect examination, Hopkins testified the trial court told Nathaniel to take care of his outstanding warrants during the hearing on July 17, 2024.

¶ 10        The State called Nathaniel to testify as an adverse witness. During the hearing on July 17, 2024, the trial court informed Nathaniel that he needed to resolve his outstanding warrants if he wished to participate in any future hearings in K.N.'s case. Nathaniel had known he had outstanding warrants in McLean County since March 31, 2023. Nathaniel knew that one way to resolve his warrants was to turn himself in. However, from July 2024 through June 2025, he refused to return to Illinois voluntarily. Nathaniel did not have any contact with his son after July 17, 2024. Nathaniel was arrested in Portland, Oregon, on March 19, 2025, due to his

outstanding warrants, and he spent 49 days incarcerated before being released. On June 3, 2025, he was arrested near Tacoma, Washington, due to his outstanding warrants, and he spent another 85 days incarcerated. He was extradited to Illinois on August 26, 2025.

¶ 11　　　　Nathaniel testified DCFS "never" reached out to him, but he had reached out to them "multiple times." He estimated he contacted Hopkins and DCFS "[p]robably three times." He testified he never received a copy of his service plan. Nathaniel believed he could not engage in services or participate in court hearings due to his outstanding warrants. Nathaniel testified he tried to talk with K.N. "multiple times," but he was "banned" from doing so. When asked why he did not resolve his warrants earlier, Nathaniel answered:

"I—I tried to. I called the state's attorney here, I left multiple messages. I've written a letter to [the trial court] explaining to him my injuries and asking him to quash the warrants and let me get a court date and appear for the warrants via Zoom while I get medical treatment for my injuries.

I never heard anything back from any of them.

I've called the public defender's office here multiple times.

I've called my *** paid attorney, Patrick Halliday, multiple times, and Patrick Halliday said that the State wouldn't communicate back with him. We've tried to resolve this multiple times over the last two years."

¶ 12　　　　During direction examination by the guardian *ad litem*, Nathaniel acknowledged he admitted to being K.N.'s father in an earlier family case and he considered himself to be K.N.'s father since K.N.'s birth. The last time Nathaniel sent K.N. a gift was Christmas of 2023.

¶ 13　　　　Jessi testified she was K.N.'s foster mother and maternal grandmother. K.N. had been in her care since the case began in May 2024. During the case's pendency, Nathaniel called

Jessi just once to ask about K.N. Nathaniel did not send any gifts, money, or supplies to help her care for K.N.

¶ 14    The trial court found the State proved by clear and convincing evidence that Nathaniel failed to maintain a reasonable degree of interest, concern, and responsibility for K.N.'s welfare. The court emphasized that, when Nathaniel appeared remotely via Zoom at the hearing on June 17, 2024, it advised "he would no longer be allowed to participate in court hearings or proceedings until he cleared up the warrant that was outstanding in other cases here in McLean County." The court explained this restriction thusly:

> "The reason for that is there are rules in place, including administrative rules that won't allow individuals to participate remotely when they have other obligations that they're ordered and required to appear for. You don't get the benefit of avoiding other things to take care of other business.
>
> Those are the rules, and that's why I told [Nathaniel] you need to clear up those warrants before I will allow you to participate by Zoom.
>
> I allow parents to participate by Zoom out of state all the time, but they don't have other obligations in this county, in the state that they need to take care of, and you didn't take care of that. You were told at that time that you had those issues to resolve."

The court found the State did not prove Nathaniel failed to make reasonable efforts or progress addressing the conditions that caused K.N. to be placed in the care of DCFS because the evidence showed Nathaniel did not receive the service plan until June 2025. However, based on Nathaniel's refusal to resolve his outstanding warrants by turning himself in, as well as the minimal efforts he made to contact K.N., the court found he failed to maintain a reasonable

degree of interest, concern, and responsibility for K.N.

¶ 15　　　　The matter then proceeded to a best-interests hearing, after which the trial court found it was in K.N.'s best interests to terminate Nathaniel's parental rights.

¶ 16　　　　This appeal followed.

¶ 17　　　　　　　　　　　　　　II. ANALYSIS

¶ 18　　　　On appeal, Nathaniel argues the trial court's unfitness finding was against the manifest weight of the evidence. He does not challenge the court's best-interests finding. We affirm.

¶ 19　　　　　　　　　　　　A. Standard of Review

¶ 20　　　　To terminate an individual's parental rights, the State must first show the parent is unfit by clear and convincing evidence. 705 ILCS 405/2-29(2) (West 2024); *In re J.H.*, 2020 IL App (4th) 200150, ¶ 67. "The trial court is given broad discretion and great deference in matters involving minors." *In re E.S.*, 324 Ill. App. 3d 661, 667 (2001). We will not reverse an unfitness finding unless it is against the manifest weight of the evidence. *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 48. "A decision is against the manifest weight of the evidence when the opposite conclusion is clearly apparent." *Ta. T.*, 2021 IL App (4th) 200658, ¶ 48.

¶ 21　　　　　　　　　　　　B. Unfitness Finding

¶ 22　　　　The Adoption Act provides several grounds on which a trial court may find a parent unfit. See 750 ILCS 50/1(D) (West 2024). Those grounds include a parent's "[f]ailure to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare." 750 ILCS 50/1(D)(b) (West 2024). In determining whether a parent failed to maintain a reasonable degree of interest, concern, or responsibility for their child's welfare, a court "should consider the parent's efforts to visit the child and to otherwise maintain contact with the child, as well as

the parent's inquiries into the child's welfare." *J.H.*, 2020 IL App (4th) 200150, ¶ 72. "If circumstances make personal visitation impractical, the court should consider the extent to which the parent showed reasonable interest, concern, and responsibility by other means, such as letters, telephone calls, and gifts to the child, 'taking into account the frequency and nature of those contacts.' " *J.H.*, 2020 IL App (4th) 200150, ¶ 72 (quoting *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006)). The court will consider the parent's efforts, rather than the success of those efforts. *In re Adoption of H.B.*, 2012 IL App (4th) 120459, ¶ 42.

¶ 23        The evidence supports the trial court's unfitness finding. During the case's pendency, Nathaniel called K.N.'s foster mother just once to ask about K.N.'s welfare. Nathaniel had not sent K.N. any gifts or presents since Christmas of 2023, several months before K.N.'s case began. Nathaniel did not send any gifts, money, or supplies to K.N.'s foster mother to help her care for K.N. He did not visit K.N. in person at any point during the case. This is because he fled Illinois to try to avoid being arrested for his outstanding warrants. When Nathaniel made his first appearance in this case on June 17, 2024, the trial court informed him that he needed to resolve his outstanding warrants. Nathaniel knew he could resolve his warrants by turning himself in. However, Nathaniel refused to do so. Instead, Nathaniel returned to Illinois because he was extradited following his second out-of-state arrest. When asked why he did not resolve his warrants, Nathaniel claimed he "tried to," and then he proceeded to blame the trial court, the state's attorney's office, the public defender's office, and his private counsel. Nathaniel prioritized his desire to evade Illinois law enforcement over his relationship with K.N., and he made minimal efforts to show interest, concern, or responsibility for K.N. Accordingly, the court's unfitness finding was not against the manifest weight of the evidence, as the opposite conclusion is not clearly evident. See *In re A.L.*, 409 Ill. App. 3d 492, 500 (2011).

## III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.